FILED

2005 Jun-23  PM 12:06
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **GOLDMARK, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Civil Action No. CV-04-S-1339-S** |
| | ) | |
| **DORNOCH, LIMITED,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

This action is before the court on defendant's tripartite motion to dismiss counts II and III of plaintiff's third amended complaint, to strike plaintiff's prayer for punitive damages, and to transfer venue to the United States District Court for the Eastern District of New York.[1]  Both parties have filed memoranda in support of their opposing positions.[2]  For the reasons set forth below, the court concludes that a discretionary transfer of venue pursuant to 28 U.S.C. § 1404(a) is appropriate.  In light of this resolution, the remaining parts of defendant's motion need not be addressed.

---

[1] Doc. no. 31 (Defendant's Motion to Dismiss Counts II and III and to Strike Demand for Punitive Damages and Motion to Transfer Venue).  Defendant's motion was originally converted to a motion for summary judgment, *see* doc. no. 32 (Conversion Order), but that order subsequently was vacated.  *See* doc. no. 38 (Order Granting Defendant's Motion to Vacate).  Accordingly, the court will treat the motion as originally pled.

[2] *See* doc. no. 29 (Defendant's Brief in Support of Motion to Dismiss, Strike, and Transfer Venue); doc. no. 35 (Plaintiff's Brief and Evidentiary Submission in Opposition to Defendant's Motions); doc. no. 40 (Defendant's Reply Brief); doc. no. 39 (Plaintiff's Supplemental Response).

## I.  FACTUAL AND PROCEDURAL BACKGROUND

This case involves a coverage dispute under an internationally arranged insurance agreement between an American insured and a group of English insurers. Plaintiff, Goldmark, Inc., a New York corporation principally operating in Brooklyn, New York, is involved in the production and sale of gold to wholesalers, for use in the creation of fine jewelry.[3]  To protect itself against the possibility of financial hardship due to loss of its valuable product, plaintiff sought to avail itself of an "All Risks Physical Loss" insurance policy from insurers at Lloyd's of London ("Lloyd's").[4]  To that end, plaintiff retained the services of Carol Tyler ("Tyler"), a licensed insurance broker working for BRM Services, Inc. ("BRM"), in Birmingham, Alabama.[5]  Tyler, in turn, contacted Denis M. Clayton & Company, Limited ("DMC"), a London-based firm that is authorized to broker policies between prospective insureds and syndicates of insurers affiliated with Lloyd's.[6]  Although neither plaintiff nor Tyler have indicated the reasons for the creation of this

---

[3] *See*, *e.g.*, doc. no. 20 (Plaintiff's Motion to Amend Complaint), Attachment 1 (Second Amended Complaint), ¶ 1, 5.  Although the *third* amended complaint is currently before the court, Goldmark did not re-plead paragraphs 1-11 in the most recent version, choosing instead to incorporate those paragraphs by reference.  *See* doc. no. 27 (Third Amended Complaint).

[4] *See* doc. no. 35, Exhibit 3 (Affidavit of Carol Tyler), ¶ 3; doc. no. 40, Attachment 1 (Reply Declaration of Owen Carragher), Exhibit C (Affidavit of John Clouston), ¶ 11.

[5] *See* doc. no. 35, Exhibit 2 (Affidavit of Shimshon Jalas), ¶ 2; *see also id*. at Exhibit 3, ¶ 3.

[6] *See id*. at Exhibit 3, ¶ 3; doc. no. 40, Attachment 1, Exhibit C, ¶ 11.  DMC was originally a defendant in this case, but plaintiff consented to its dismissal.  *See* doc. no. 26 (Order Granting DMC's Motion to be Dismissed).

cumbersome arrangement, several individuals with specialized knowledge of the
Lloyd's "market"[7] have explained through affidavits that this structuring is of
necessity.    For example, Ann-Louis Seago, an insurance underwriter with
considerable experience transacting business through Lloyd's, stated that:

> A person wishing to purchase insurance from Lloyd's cannot do so
> directly.  Instead, the person must act through a broker that has been
> approved by Lloyd's to place risks with Lloyd's syndicates.  This
> 'placing broker' is often referred to as a 'Lloyd's broker.'  Lloyd's
> brokers usually act as agents for the insured.  In this case, the Lloyd's
> broker for the contract of insurance that is at issue was Dennis [*sic*.] M.
> Clayton & Company, Ltd . . . . There is also typically a producing broker
> in the United States.  Producing brokers are not authorized to deal
> directly with Lloyd's and that is true of the producing broker in this
> case, BRM Services.  By the same measure, insureds do not negotiate
> their insurance directly with Lloyd's, they act through their brokers.
> Usually, the producing broker acts as a link in the communications
> between the insured, the Lloyd's broker and Lloyd's.[8]

---

[7] "Lloyd's is actually a marketplace, where numerous syndicates of insurers agree to insure risks."  Doc. no. 29, Attachment 2 (Declaration of Ann-Louis Seago), ¶ 6.  *See also* doc. no. 40, Attachment 2 (Declaration of Elizabeth Jane Andrewartha), ¶ 6 (explaining that "Lloyd's is an insurance marketplace of 66 different Syndicates of Names who operate from the 'Room' in the Lloyd's Building (in many ways like the floor of a stock or commodities exchange, albeit with less commotion)").

[8] Doc. no. 29, Attachment 2, ¶¶ 8-9.  While Shimshon Jalas, President of Goldmark, has proclaimed that "[a]t no time was Denis M. Clayton & Company, Ltd., representing the interests of Goldmark," *see* doc. no. 35, Exhibit 2, ¶ 2, the court is convinced that the Seago explanation, which is corroborated by several other affidavits, is correct.  *See* doc. no. 40, Attachment 2, ¶ 8 (stating that "[t]he Seago Declaration accurately records the manner in which Lloyd's works"); *id*. at Attachment 1, Exhibit C, ¶ 2 (confirming that "DMC is a London company which is an authorized Lloyd's broker, authorized to place risks at Lloyd's of London"); *id*. at Attachment 1, Exhibit C, ¶ 6 (confirming that "BRM is an Alabama corporation which is not a broker authorized to place business at Lloyd's"); *id*. at Attachment 1, Exhibit C, ¶ 7 (confirming that "DMC had no authority to bind any of the insurers who underwrote the specific risk issued to Goldmark, serving strictly as a broker for this insured"); doc. no. 29, Attachment 1 (Declaration of Owen Carragher), Exhibit K (DMC's Answers to Plaintiff's Second Set of Interrogatories), ¶ 5 (same); *see also Julien Praet et Cie, S/A*

Shortly after being contacted by Tyler, DMC obtained a quotation on a possible policy from several syndicates of underwriters at Lloyd's.[9]  One of the underwriters participating in the "leading" syndicate that agreed to insure plaintiff's risk was the defendant, Dornoch, Limited, an English corporation with its principal place of business in London, England.[10]  "Pursuant to the standard practice, [DMC] prepared a written document . . . that was intended to memorialize the terms and conditions of the insurance contract that was being entered into between the plaintiff . . . and the subscribing Lloyd's syndicates."[11]  After the leading syndicate signed the document, the policy was sent to plaintiff *via* its stateside agent, Tyler.[12]  The terms of the policy were accepted, and coverage began on October 15, 2002.[13]

Apparently confident that it was covered by the insurance policy, between

*v. H.G. Poland Ltd.*, 1 Lloyd's Rep. 420, 428 (Queen's Bench Div. 1960) (noting that, as a matter of English law, "[t]he Lloyd's broker is the agent of the assured").

[9] *See* doc. no. 40, Attachment 1, Exhibit C, ¶ 12.  As alluded to above, each syndicate of insurers is comprised of "names": *i.e.*, "individuals that have collectively agreed to underwrite insurance business in the name of the syndicate.  Names invest funds and pledge their assets in support of the insurance that they subscribe to."  Doc. no. 29, Attachment 2, ¶ 7.  Often, as here, multiple syndicates insure a single risk, *id.* at ¶ 6, but one "leading syndicate" will act on behalf of the others.  *Id.* at ¶ 11.

[10] Doc. no. 17, Attachment 1, ¶ 2; doc. no. 29, Attachment 2, ¶ 7.  Plaintiff brought defendant Dornoch into this case as a substitute for one of the original defendants, Certain Underwriters at Lloyd's of London.  *See* doc. no. 13 (Motion for Leave to Amend Complaint), Attachment 1 (First Amended Complaint).

[11] Doc. no. 29, Attachment 2, ¶ 14.

[12] Doc. no. 35, Exhibit 3, ¶ 4; *id.* at Exhibit 1 (Contract of Insurance); doc. no. 40, Attachment 1, Exhibit C, ¶ 13.

[13] Doc. no. 40, Attachment 1, Exhibit C, ¶¶ 13, 14.

December of 2002 and January of 2003 plaintiff arranged to sell approximately $100,000 worth of gold (15 kilos) to a New York firm, Marad Industries, Limited ("Marad").[14] The transactions were predicated on unspecified credit terms.[15]  During May of 2003, however, without having tendered any payment, the principal of Marad, Markel Babaev, filed for Chapter 7 bankruptcy protection in the United States Bankruptcy Court for the Eastern District of New York.[16] By July of 2003, defendant was notified of the potential for a claim under the policy, and a New York-based insurance adjuster, Montalbano Adjustment Services ("Montalbano"), began monitoring the course of bankruptcy proceedings on defendant's behalf.[17]

Meanwhile, in the Fall of 2003, plaintiff extended credit to NK Star, Inc. ("NK Star"), allowing it to purchase $500,000 worth of gold (37 kilos).[18]  Once again, the debtor never paid for the gold; and once again, after receiving notice, defendant assigned Montalbano to evaluate the potential claim.[19]  Thereafter, in January, 2004, one of the principals of NK Star, Fred Sheffer, also filed for Chapter 7 protection in

---

[14] *See* doc. no. 20, Attachment 1, ¶ 7; doc. no. 35, Exhibit 2, ¶ 4.

[15] *See*, *e.g.*, doc. no. 29, Attachment 1, ¶ 12.

[16] *E.g.*, *id.* at ¶ 13; doc. no. 35, Exhibit 2, ¶ 4.

[17] Doc. no. 29, Attachment 1, ¶ 16.  Evidently Montalbano was instructed to "monitor" plaintiff's attempts to recover as a creditor rather than investigate the validity of the claim because defendant intended to assert that the policy contains a coverage limitation where there is a right of action against a third party.  *See id.*; *see also* doc. no. 29, Attachment 2, ¶ 17.

[18] *E.g.*, doc. no. 20, Attachment 1, ¶ 9; doc. no. 35, Exhibit 2, ¶ 5.

[19] *E.g.*, doc. no. 29, Attachment 1, ¶¶ 18, 19.

the United States Bankruptcy Court for the Eastern District of New York.[20]

On May 18, 2004, while the claims investigation apparently was ongoing,[21] plaintiff filed this suit in the Circuit Court of Jefferson County, Alabama, alleging breach of contract, and seeking to recover damages for bad faith failure to investigate and cover plaintiff's claim.[22]   After removal of the case to this court,[23] three amendments to the complaint,[24] and the dismissal or substitution of all other defendants,[25] defendant Dornoch filed the present motion, in which it prays for, among other things, a transfer of venue.[26]

## II.  THE MOTION TO TRANSFER VENUE

Motions for transfer of venue are controlled by 28 U.S.C. § 1404.  Section 1404(a) provides that, "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought."  The Supreme Court has observed that the goal

---

[20] *See*, *e.g.*, *id*. at ¶ 20; doc. no. 35, Exhibit 2, ¶ 5.

[21] *See* doc. no. 29, Attachment 1, ¶ 11.

[22] Doc. no. 1 (Notice of Removal), Exhibit A (State Court Complaint).  While the complaint does not indicate the exact provision on which plaintiff relies in asserting that these losses are covered, it would appear that plaintiff is attempting to invoke a provision stating that "[p]hysical losses of material at 3rd Party Locations discovered/disclosed upon bankruptcy of the 3rd Party is included hereunder."  Doc. no. 35, Exhibit 1, p. 3.

[23] Doc. no. 1.

[24] Doc. no. 13; doc. no. 20; doc. no. 27.

[25] Doc. no. 26 (dismissing DMC); doc. no. 13 (substituting Dornoch in place of Certain Underwriters).

[26] Doc. no. 29.

of § 1404(a) is not to shift inconvenience, nor is it to allow adjudication in a forum that is "likely to prove equally convenient or inconvenient." *Van Dusen v. Barrack*, 376 U.S. 612, 646 (1964). Instead, the appropriate forum is the one "in which judicial resources could most efficiently be utilized and the place in which the trial would be most 'easy, expeditious and inexpensive.'" *Howell v. Tanner*, 650 F.2d 610, 616 (5th Cir. 1981) (internal citations omitted).[27] The ultimate decision, however, is within the sound discretion of the tribunal. *See*, *e.g.*, *Ross v. Buckeye Cellulose Corp.*, 980 F.2d 648, 654 (11th Cir. 1993) (noting that "this court will overturn a trial judge's ruling that a transfer is justified only upon a showing of 'a clear abuse of discretion'") (internal citations omitted); *see also England v. ITT Thompson Industries, Inc.*, 856 F.2d 1518, 1520 (11th Cir. 1988).

## A.  Preliminary Matters

Before identifying the factors to be considered and reaching the merits of the parties' arguments, two preliminary tasks are at hand. First, because § 1404(a) is only applicable "where the plaintiff's chosen venue is an appropriate venue," *Holmes v. Freightliner, LLC*, 237 F. Supp. 2d 690, 692 (M.D. Ala. 2002), the court must look to the venue statute, 28 U.S.C. § 1391, to ensure that the Northern District of

---

[27] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

Alabama is at least a legitimate forum, regardless of convenience.[28]  *See id.*  This inquiry is easily answered, however, because section 1391(d) permits "[a]n alien [to be] sued in *any* district."  *Id.* (emphasis supplied); *see also James Talcott, Inc. v. Allahabad Bank, Ltd.*, 444 F.2d 451, 464 n.11 (5th Cir. 1971) (noting that under § 1391(d), "New Central [as an Indian business enterprise] could be sued for venue purposes in any district in the United States"); 15 Wright, Miller & Cooper, *Federal Practice & Procedure* § 3810 (2d ed. 1986) (noting that "[t]he rule that an alien can be sued in any district applies to corporations incorporated in a foreign country just as it does to alien individuals").  Since the defendant in this diversity case is a legal entity organized in the United Kingdom, it is clear that the plaintiff's chosen venue is permissible.[29]

Second, by its terms, § 1404(a) limits the range of potential transferee courts to those located in a district or division "where [the action] might have been brought."  *See* 28 U.S.C. § 1404(a).  Here, defendant has petitioned the court to transfer the case

---

[28] Were venue not proper in this court, the appropriate transfer of venue statute would be 28 U.S.C. 1406(a), which includes outright dismissal of the action as an option.

[29] *See, e.g.*, doc. no. 20, Attachment 1, ¶ 2.  Although plaintiff — either out of ignorance or a desire to distract the court  — devotes a substantial portion of its brief to a discussion of personal jurisdiction, defendant has not raised this issue, *Palmer v. Braun*, 376 F.3d 1254 (11th Cir. 2004) (discussing waiver of personal jurisdiction), and in any event, personal jurisdiction is totally irrelevant to the issue of transfer of venue.  *E.g.*, *Goldlawr, Inc. v. Heiman*, 369 U.S. 463, 466, 82 S. Ct. 913, 916, 8 L. Ed. 2d 39 (1962) (authorizing transfer of venue under 28 U.S.C. § 1406(a) regardless of the existence of personal jurisdiction).

to the United States District Court for the Eastern District of New York. As the previous discussion of § 1391(d) makes clear, there is no barrier to suing an alien such as defendant in *any* venue, including the Eastern District of New York. Moreover, no party appears to contest that the transferee court would have personal jurisdiction over defendant.

**B.     The Statutory Factors**

Having determined that a motion pursuant to § 1404(a) is the correct procedural vehicle for obtaining transfer, and that the proposed transferee court is capable of hearing the case, there remains the decision of whether transfer is warranted. All motions pursuant to § 1404(a) require "an individualized case-by-case consideration of convenience and fairness." *Stewart Org.*, *Inc. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988) (quoting *Van Dusen*, 376 U.S. at 622). "The three factors mentioned in the statute, convenience of the parties and witnesses and the interest of justice, are broad generalities that take on a variety of meanings in specific cases." 15 Wright, Miller & Cooper, *Federal Practice & Procedure* § 3847 (2d ed. 1986). Within each of the statutory factors lies a more specific inventory.

**1.     Convenience of the parties**

Among the many considerations to be weighed in evaluating the convenience

of the forum for the parties are:

> the relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; possibility of view of premises, if view would be appropriate to the action, and all other practical problems that make trial of a case easy, expeditious and inexpensive.

*Koehring Co. v. Hyde Constr. Co.*, 324 F.2d 295, 296 (5th Cir. 1963) (quoting *Gulf Oil v. Gilbert*, 330 U.S. 501, 508 (1947)); *see also Holmes*, 237 F. Supp. 2d at 692; *Johnston v. Foster-Wheeler Constructors, Inc.*, 158 F.R.D. 496, 504 (M.D. Ala. 1994).

In addition to these practical matters, it is noteworthy that the great majority of courts afford considerable deference to the plaintiff's choice of forum, and thus require the defendant to establish that balance of factors weighs in its favor. *See Gulf Oil Corp.*, 330 U.S. at 508 (instructing that, under the doctrine of *forum non conveniens*, "[u]nless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed"). However, this is not the case where the plaintiff's choice of forum has minimal relation to the subject matter of the lawsuit, or where plaintiff chooses a forum other than its home state. *See, e.g., Johnston*, 158 F.R.D. at 505 (noting that, "[w]here none of the conduct complained of took place in the forum selected by Plaintiff, the Plaintiff's choice of forum is of minimal value in

determining whether to transfer an action"); *Ramsey v. Fox News Network, LLC*, 323 F. Supp. 2d 1352, 1355 (N.D. Ga. 2004) (observing that "[a]lthough the Plaintiffs' choice of forum is typically granted a great deal of deference, it is entitled to less weight when none of the parties resides there"); *Hutchens v. Bill Heard Chevrolet Co.*, 928 F. Supp. 1089, 1091 (M.D. Ala. 1996) ("'where the forum selected by the plaintiff is not connected with the parties or the subject matter of the lawsuit, it is generally less difficult than otherwise for the defendant [to establish the necessary inconvenience]'") (internal   citations omitted).   *See generally*, *Norwood v. Kirkpatrick*, 349 U.S. 29,  32 (1955) (holding that, when enacting § 1404(a), "Congress . . . intended to permit courts to grant transfers upon a lesser showing of inconvenience.  This is not to say that the relevant factors have changed or that the plaintiff's choice of forum is not to be considered, but only that the discretion to be exercised is broader").  *See also In re Ricoh Corp.*, 870 F.2d 570, 572 (11th Cir. 1989).

Defendant is quick to point out that, not only is plaintiff *not* a resident of the State of Alabama, but plaintiff's insurance agreement was obtained from an English insurer in the United Kingdom, and the property to be covered by the insurance was located in the State of New York.  Defendant's theory for why plaintiff filed suit in Alabama is that plaintiff "has engaged in an extreme example of forum shopping,"

in order to sue in a jurisdiction which, unlike New York, allows damages for bad faith failure to cover an insurance claim.[30] Furthermore, defendant alleges that plaintiff has endeavored to complicate defendant's trial strategy by filing suit in a court that would lack the power to compel certain key witnesses to testify at trial.[31]

Plaintiff, while unable to argue against the fact that it does not reside in Alabama, goes to great lengths to assert that Alabama is somehow connected with the subject matter of the lawsuit. This is simply not the case. Plaintiff's action for failure to cover certain losses sustained in *New York*, under an insurance agreement brokered in and issued from *England*, bears little, if any, relation to the State of Alabama.[32] On top of that, plaintiff is not a citizen or resident of this state. The court has no way of corroborating defendant's rather serious allegations that plaintiff has filed suit here to impair its opponent's ability to defend the case, but defendant's evidence of forum

---

[30] Doc. no. 29, Attachment 1, ¶ 3. *Compare New York Univ. v. Continental Ins. Co.*, 662 N.E.2d 763, 767, 769 (N.Y. 1995) (holding that, under New York law, there is no independent cause of action for an insurer's bad faith failure to investigate or cover a claim; such allegations "merely raise[] a question for the fact finder determining the breach of contract claim") *with Chavers v. National Sec. Fire & Cas. Co.*, 405 So.2d 1, 7 (Ala. 1981) (holding that under Alabama law, where certain elements are met, "an actionable tort arises for an insurer's intentional refusal to settle a direct claim").

[31] *Id*. at ¶ 4.

[32] As discussed *supra*, while plaintiff contests the claim that the agreement was entered into abroad, arguing that its American broker was actively negotiating from Alabama, it appears beyond doubt that the policy was actually obtained for plaintiff by DMC, and Tyler served merely as plaintiff's agent for the purpose of communicating with its English broker. *See* doc. no. 40, Attachment 1, Exhibit C, ¶ 7.

shopping is interesting, to say the least.  *See* 15 Wright, Miller & Cooper, *Federal Practice & Procedure* § 3849 (2d ed. 1986) (noting that courts "give more weight to the choice of a district . . . when that choice seems to have been made in good faith rather than as a matter of forum shopping").  Given the curiousness of plaintiff's reasons for filing suit in Alabama, defendant's burden in showing that a transfer is warranted is significantly reduced.  *See*, *e.g.*, *Johnston*, 158 F.R.D. at 505.

Specifically, defendant has convinced the court that a transfer will increase the availability of certain key witnesses, and, decrease the costs associated with bringing them to court.  Among those expected to be key witnesses are Fred Sheffer, Nellie Romaniuk, and Markel Babaev, all of whom are principals of the firms that have allegedly refused to pay plaintiff for the gold, and all of whom are residents of the State of New York.[33]  Plaintiff downplays the significance of these witnesses, doting instead on the importance of a single person — its Alabama agent, Tyler — to the resolution of this controversy.  In this respect, the court notes that the law favors the defendant, for witnesses who are "closely aligned with a party . . . are presumed to be more willing to testify in a different forum."  *See Ramsey*, 323 F. Supp. 2d at 1356.  Tyler has filed an affidavit in support of plaintiff's arguments, and apparently has an ongoing business relationship with plaintiff, whereas Sheffer, Romaniuk, and Babaev

---

[33] Doc. no. 29, Attachment 1, ¶ 29.

do not identify with defendant.  Also, any good will which might have previously existed between Sheffer, Romaniuk, or Babaev on the one hand, and plaintiff, on the other, has now dissipated as a result of the ongoing dispute over payment for the gold. Therefore, plaintiff likely would have less difficulty persuading Tyler to appear in New York, than either party would have in attempting to persuade Sheffer, Romaniuk, and Babaev to travel to Alabama.

Defendant also names as possible witnesses Peter Montalbano, of the adjustment services company assigned to investigate plaintiff's claims, and Ann-Louis Seago, an underwriter with knowledge of the case.[34]  Again, both are residents of New York.[35]  To be sure, both of these potential witnesses are aligned with defendant, and as such, are presumptively willing to travel to Alabama, but their availability does not change the fact that three critical *non-party* witnesses will be outside the reach of *this court's* subpoena power.  Moreover, plaintiff's own employees presumably reside in New York, so transferring the case to a federal court in that State would not merely shift the burden.  If anything, subsidizing the travel of Tyler (the sole out-of-state witness it mentions), rather than the countless employees domiciled in New York, would result in a net *savings* for plaintiff.  Likewise, it would

---

[34] *Id*. at ¶ 28.

[35] *Id.*

be more cost-effective and convenient for defendant's overseas employees to appear in New York.[36]

Plaintiff's concerns about access to documents are subject to the same reasoning. If in fact plaintiff does not already have copies of the relevant documents at its establishment in New York — and the court has not heard such an allegation — it would nonetheless appear that Tyler would be willing to provide copies of them to plaintiff. Other materials, such as the documents evidencing the credit arrangements between plaintiff and the delinquent New York companies, are also assuredly on file in New York; and moving the case from Alabama would have no impact on the availability of defendant's records, which are all located in England.

As a final note regarding convenience of the parties, the fact that plaintiff or defendant might find it necessary to obtain new counsel if the case is transferred is not a significant consideration. *See Ramsey*, 323 F. Supp. 2d at 1356. Of course, even if it were, defendant is apparently comfortable with this possibility, and plaintiff has not raised it as a concern.

## 2. Convenience of the witnesses

It is often said that "the most important factor in passing on a motion to transfer

---

[36] *See id.* at Exhibit N (London to New York Flight Listings).

under § 1404(a) is the convenience of the witnesses." *Hutchens*, 928 F. Supp. at 109;

*see also Insuracorp*, *Inc. v. American Fid. Assur. Co.*, 914 F. Supp. 504, 506 (M.D.

Ala. 1996).   This court agrees.   In view of the lengthy discussion of the relative

hardships likely to be suffered by each of the potential witnesses, depending on the

location of the trial, that is set out above, there is no reason to further remark on this

prong of the analysis, other than to explain that it weighs in favor of the defendant.

Plaintiff has managed to proffer only a single witness that it claims will be

inconvenienced by a transfer of this action, whereas defendant has named three key

non-party witnesses and two partisan witnesses who would be asked to travel from

New York City to this courthouse in Alabama.   Additionally, defendant has shown

that its employees in England and plaintiff's employees in New York could reach the

United States District Court for the Eastern District of New York quicker and cheaper

than they could reach Alabama.

### 3.    Interest of justice

The final statutory requirement, that the transfer be "in the interest of justice,"

calls for an objective evaluation of a diverse set of factors.   The preeminent

considerations include the importance of "having localized controversies decided at

home," the desire to avoid imposing jury duty "upon the people of a community

which has no relation to the litigation," and the administrative convenience of "having the trial of a diversity case in a forum that is at home with the state law that must govern." *Gulf Oil*, 330 U.S. at 509; *see also Roofing & Sheet Metal Servs.*, *Inc. v. La Quinta Motor Inns*, 689 F.2d 982, 991 (11th Cir. 1982); *Koehring*, 324 F.2d at 296.

Defendant maintains that the interests of justice support a transfer, claiming that New York law applies to plaintiff's claims, and that Alabama's connection to the dispute is tenuous at best.  Drawing on both the local interest factor and the governing law consideration, plaintiff urges the court to deny transfer on the ground that the people of Alabama have an interest in safeguarding the ability of aggrieved insureds to vindicate their rights.  Plaintiff contends that this interest is reflected in Alabama law, both statutory and common.  First, plaintiff alleges that the State Legislature, through Alabama Code § 27-14-22, has issued an affirmative statement in favor of deciding this matter according to Alabama's law and within Alabama's borders.  But plaintiff, in arguing that the policy underlying this case is subject to the statute, has misinterpreted the legislature's language as well as its intent.[37]

---

[37] The court recognizes that, because this case will be transferred, there is no need to conclusively decide choice of law issues. *See Hercules Co. v. S.S. Aramis*, 226 F. Supp. 599 (D.C. La. 1964).  However, choice of law is highly relevant to the extent that the probable law to be applied bears on the decision whether or not to transfer. *See Koehring*, 324 F.2d at 296.  When this case is transferred, the transferee court will have the opportunity — indeed, the obligation — to look to Alabama choice of law rules to determine on its own which state's law to apply. *Compare Klaxon*

Section 27-14-22 provides that "[a]ll contracts of insurance, the application for which *is taken* within this state, shall be deemed to have been made within this state and subject to the laws thereof." *Id.* (emphasis supplied).  Regardless of the fact that the application *originated from* Alabama, the statute's applicability is dependent upon the application being "taken within" this state.  *See American Economy Ins. Co. v. Thompson*, 643 So.2d 1350, 1355 (Ala. 1994).  The parties may be split on whether, during the negotiations, the insurer was represented by DMC or by the defendant's syndicate at Lloyd's of London, but it appears quite plain that the application was "taken within" *England*.[38]  The only conceivable way that the application could be "taken within" Alabama is if Tyler had accepted it on behalf of Lloyd's.  But this possibility is foreclosed by Tyler's own statement in her affidavit that "[a]t all times relevant to the policy which is made the basis of this suit, I was acting as an agent for Goldmark, Inc."

Plaintiff's second argument is that the citizens of this state have an interest in

---

*Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1947) (holding that, in a diversity case, a federal court must apply the conflict of law rules of the state in which it sits) *with Ferens v. John Deere Co.*, 494 U.S. 516, 519 (1990) (holding that, in both plaintiff- and defendant-initiated transfers, the choice of law rules of the state in which the transferor court sits continue to apply).

[38] As discussed *supra*, it is also rather clear that, in fact, it was defendant's syndicate at Lloyd's of London that fielded the application;  DMC was working on behalf of plaintiff.  As counsel for defendant aptly points out, if plaintiff truly believed that DMC was an agent for *Lloyd's*, and not its own, its decision to consent to DMC's dismissal from this action would make little sense.  *See* doc. no. 24 (Plaintiff's Motion to Dismiss DMC).

deciding this matter because Alabama law governs the adjudication of insurance policies that are "delivered or issued for delivery in this state." *Cotton v. State Farm Mut. Auto. Ins. Co.*, 540 So.2d 1387, 1388 (Ala. 1989). Notably, the rule from *Cotton* was taken from the language of the uninsured motorist statute that was issue in that case, and does not necessarily apply to other types of insurance contracts. *See id.* In fact, without deciding the law to be applied in this case, the court notes that applying *Cotton* to these facts would fly in the face of the "traditional view that a contract is governed as to its nature, obligation, and validity by the law of the place where it was made, *unless . . . it is to be wholly performed in some other place.*" *Ex Parte Owen*, 437 So.2d 476, 481 (Ala. 1983) (emphasis supplied). Here, of course, regardless of where the contract was executed, the exclusive insured under the policy is a New York corporation with its principal place of business in New York. The property to be insured was located in New York, and plaintiff's claims were investigated by a New York adjusting firm. Therefore, to the extent that it appears likely that Alabama choice of law rules would counsel application of New York law, transfer of venue to a federal court familiar with New York law is preferred. *See Holmes*, 237 F. Supp. 2d at 695.

The fact that Alabama law would probably not govern this dispute impacts another aspect of the interest of justice analysis. That is, the representatives of the

people of this state, from both the legislative and the judicial branches, have crafted legal rules that imply that this sort of controversy is not a matter of local concern. Conversely, resolution of this dispute involving a successful New York corporation may be of particular interest to the citizens of New York. *See Koehring*, 324 F.2d at 296.  Rather than holding the trial "in [a] remote part[] of the country where [New York citizens] can learn of it by report only," transferring the case will allow those with the most significant connections to view the proceedings and to serve as jurors.

In view of the probable application of New York law and the insignificance of Alabama's connection with this controversy, a transfer of venue would serve not only the interest of convenience, but also the interests of justice.

### III.  CONCLUSION

For the foregoing reasons, defendant's motion to transfer venue to the United States District Court for the Eastern District of New York is due to be granted.  In light of this disposition, the court does not pass on defendant's other motions.  An appropriate order will be entered contemporaneously herewith.

DONE this 23rd day of June, 2005.

_____
United States District Judge